**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| TERA LYNN SCHARTZ, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NANCY A. BERRYHILL, ACTING | ) | NO. 15-3125 |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

This is action for review - - pursuant to 42 U.S.C. § 405(g) - - of the denial of the Plaintiff's claims for supplemental security income and disability insurance benefits.

Pending are the Plaintiff's Motion for Summary Judgment and the Defendant's Motion for Summary Affirmance.

For the reasons that follow, the Court concludes that the Commissioner's decision is not supported by substantial evidence.

## I. INTRODUCTION

Plaintiff Tera Lynn Schartz was born in 1993.  In late 2011, at the age of 18 years old, the Plaintiff made informal applications for supplemental security income

and disability insurance benefits, alleging she became disabled on January 1, 2011, when she was 17, due to a learning disability and ADHD. Her only past relevant work was for two days at "Paulette's Food Service."

The Plaintiff's applications were denied initially and on reconsideration. She requested a hearing, which was held before Administrative Law Judge Barbara J. Welsch on January 28, 2014. The Plaintiff was represented by counsel and testified at the hearing. In a Decision dated February 27, 2014, the ALJ denied the claim. The Appeals Council declined review of the ALJ's Decision. The Plaintiff timely filed this action.

## II. BACKGROUND

Documentary Evidence

The Plaintiff alleges she has intellectual deficits which have been measured throughout her formative years on a number of occasions. On February 22, 2002, the Plaintiff's treating psychologist, Michael Trieger, Psy. D., administered a Weschler Intelligence Scale for Children–III (WISC–III), an IQ test. She scored a verbal IQ of 75, a performance IQ of 69, and a full scale IQ of 70.

On February 12, 2014, Dr. Trieger again evaluated the Plaintiff for mental status and levels of intellectual functioning. He noted she had received special education for much of her schooling. She finished cosmetology school, but received

a number of accommodations. Dr. Trieger administered a Weschler Adult Intelligence Scale, Fourth Edition (WAIS-IV). The Plaintiff's verbal comprehension scale was 70 (second percentile), her perceptual reasoning was 81 (low average, tenth percentile), her working memory was 74 (borderline range, fourth percentile), her processing speed was 71 (borderline range, third percentile), and her full scale IQ was 70 (borderline, second percentile). Dr. Trieger found these scores to be "consistent with prior examinations and indicate global skills in the borderline to mildly impaired range," though he noted "[s]he displays a relative strength in her perceptual reasoning." He also stated the Plaintiff "has a documented history [of] attention deficits, depressive disorder, learning disabilities and cognitive deficits." R. 424. Dr. Trieger cited the Plaintiff's mother's account in finding that Plaintiff has "noteworthy delays/deficits of adaptive functioning. If Tera were found eligible for SSI benefits, she would most likely need a third party payee." R. 424. He diagnosed her with ADHD, residual type, a depressive disorder, not otherwise specified, and borderline intellectual functioning with consequential learning disabilities. Her Global Assessment of Functioning score was 45.

Dr. Trieger observed a number of problems when he saw the Plaintiff as a young child in 1997, 1998 and 1999. He thought her problems were more significant than ADHD or Oppositional Defiant Disorder and that educating the Plaintiff would

be a challenge. He also thought there was a possibility that learning disabilities would emerge over time.

The Plaintiff qualified for special education services. In 2011, special education personnel noted that Plaintiff's biggest problems were difficulty organizing tasks or projects, difficulty sustaining attention to task, failure to finish or turn in schoolwork, she was easily distracted by external stimuli and needs close supervision to complete assigned tasks. She was unorganized and unprepared and had difficulty "settling in and getting started." R. 273. She benefitted from one-on-one situations and "having everything read to her." R. 273. The Woodcock Johnson III test administered in February of 2010 indicated a broad reading score of 64, math 74, written language 66, and oral language 69. The Plaintiff was receiving special education class management from her school to meet a vocational goal of attending and completing cosmetology school.

The Plaintiff's primary care physician also documented continuing deficits in attention. She was prescribed ADHD medication and there were documented difficulties in school performance. The Plaintiff's mother noted some problems as well.

In March 2012 Dolores Trello, Psy. D., diagnosed the Plaintiff with attention deficit disorder with hyperactivity and, based on a clinical examination, stated the

Plaintiff "may have a limited IQ." Like Dr. Trieger, Dr. Trello stated she would need assistance in handling funds.

State agency reviewing psychologist, Russell Taylor, Ph.D, did not assess the Plaintiff's claim under Listing 12.05, which addresses intellectual disorders which manifest before the age of 22. Instead, he assessed her under Listing 12.02 for organic mental disorders, which he described as ADHD/LD. Dr. Taylor found that she had moderate restriction of activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. He based his opinion on her full scale IQ in 1999 and noted that the Plaintiff's treating source stated she was cooperative at an examination. Dr. Taylor noted she reported many friends, played sports, did self care, cleaning, laundry when she feels like it, and had a normal affect. He referenced the fact that Dr. Trieger said she was relevant, oriented, and without psychosis, with an intact memory and "able to do serials." Dr. Taylor also stated, "CE report indicates claimant does not drive. She handles personal care and does chores at home, cleaning and laundry. She does not grocery shop. She lives with adoptive mother and step father." R. 378. Despite noting the Plaintiff was moderately impaired in a number of areas, Dr. Taylor opined that she "retains the mental capacity to understand, remember and concentrate sufficiently in order to carry out simple instructions for a normal work period." He

found that Plaintiff "could make simple work related decisions" and "interact with others sufficiently in a work setting." Dr. Taylor also opined that she could "adapt to simple, routine changes and pressures in the work environment." R. 382. State agency consultant Donna Hudspeth, Psy. D., affirmed the findings of Dr. Taylor.

In a narrative report dated May 29, 2012, Dr. Trieger noted he had been professionally acquainted with the Plaintiff since the mid 1990's. He saw her twice in 2012 for outpatient psychotherapy. Dr. Trieger stated she has "a history of learning challenges and emotional difficulties" and "[w]hile she has certainly made progress, she still has a long way to go to reach a level of functioning that would support independent living." R. 385.

Dr. Trello examined the Plaintiff again for the Department of Vocational Rehabilitation. Such an evaluation was required for the Plaintiff to continue with her career choice. The Plaintiff reported she has a learning disability and struggles with reading, spelling and math. She stated she has many friends and enjoys playing sports and "hanging out." Although the Plaintiff thought herself capable of handling money, Dr. Trello noted her concentration was poor. Dr. Trello did not utilize the Weschler Adult Intelligence Scale but used a number of other tests. While some scores were low average, the Plaintiff's long term retrieval was borderline (fifth percentile) and many scores were in the low or borderline range. For example, the Plaintiff's fluid

reasoning skills were equivalent to an average individual the age of 10 years, 10 months; visual spatial thinking is comparable to that of a 13-year old. The Plaintiff's auditory processing skills were above average and comparable to an individual the age of 28. Her worst score was in processing speed, which measures the ability to rapidly perform "automatic cognitive tasks, particularly when under pressure to maintain focused attention." R. 408. The Plaintiff scored at the level comparable to an individual who is 8 years and 4 months old, within the mildly mentally retarded range of scores obtained by others at her age level as shown by her percentile rank (0.1 percentile). She had intra-test cognitive discrepancies.

Dr. Trello diagnosed learning deficits in broad reading and broad mathematics and a learning disorder in written expression. She also diagnosed ADHD and borderline intellectual functioning. She assigned a GAF score of 50 and noted "serious impairment in academic functioning." Upon considering her scores, Dr. Trello noted the following regarding certain accommodations the Plaintiff would need for testing:

> She will do best if she is given a quiet room with few distractions given she suffers attention deficit disorder. She will need extra time on testing because she processes information very slowly. She will need supervised breaks and should require five minutes every thirty minutes of testing. She learns best in the auditory modality and an audiocassette with extended time might be helpful to her. She will need to dictate her essay questions to a scribe. She will need a calculator for mathematics.

R. 411.

In October of 2013, the Plaintiff saw a psychiatrist, Dr. Jennifer Hardwick. Dr. Hardwick noted the Plaintiff's motor activity was "fidgety," her affect was "blunted" and insight and judgment were "limited." Her mood was "okay" and thought processes were "linear." R. 416. Dr. Hardwick completed a medical source statement concerning the nature and severity of the Plaintiff's mental impairments. She found the Plaintiff was markedly limited as to the following: (1) the ability to remember locations and work-like procedures; (2) the ability to understand and remember detailed instructions of three or more steps; (3) the ability to perform activities according to a schedule, maintain regular attendance and be punctual; and (4) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Hardwick also assessed the Plaintiff with moderate limitations in a number of areas of functioning. Dr. Hardwick stated that work-related stressors such as production demands or quotas, demands for precision, and need for quick and accurate, independent decisions in problem solving. Dr. Hardwick noted that Plaintiff would be unable to complete a workday three or four times per month. She though that these limitations had been in effect since the Plaintiff was 15 or 16.

The Plaintiff testified that she is supported by her parents. She finished high school, graduated from cosmetology school, passed a state examination and had looked for work–though not in cosmetology because, she stated, she has a hard time following instructions and had passed her courses only with considerable help from her teachers. The ALJ responded, "Yeah, but I mean, to take your state boards, they couldn't have taken those for you." R. 34. The Plaintiff noted that it took her three attempts to pass the examination for school and two attempts to pass her state boards. She testified that one of her problems is that she has to ask people over and over again, "What do I do next?" She stated she would have to ask for help and was unable to figure things out.

The Plaintiff testified she was still working on getting her driver's license. She failed a driver's course and thought she was "not ready for it." R. 39.

In response to questions from her attorney, the Plaintiff stated she had help when she took the state board exams. She was allowed extra time and a break. Her high school classes contained only 10 to 12 students. In cosmetology school, the Plaintiff had a "504 Plan," which helped with her reading and "helped me pretty much pass the whole program." R.44. She thought she could follow simple instructions and testified that she got daily reminders.

9

The Plaintiff also testified that, while attending cosmetology school, she actually did some hair cutting work but "had to have a lot of help." R. 51. She had to extend the program by eight or nine weeks. The Plaintiff struggled to learn new procedures and had to have people show her how to do things correctly.

The Plaintiff's adopted mother testified that Plaintiff had difficulty in the cosmetology courses. The Plaintiff received accommodations such as a reader, additional test time, her work was always supervised and the instructors took a special interest and supervised her more closely. She was allowed to take some tests over and over until she passed. The Plaintiff's mother thought that Plaintiff would have difficulty working in the field because it is very difficult to remember what someone wants. Although she could perform the work, it would take longer than the normal amount of time.

The Plaintiff interrupted her mother's testimony when her mother was asked how long it would take the Plaintiff to cut her sister's hair at home, blurting out "twenty minutes." However, her mother testified it took 45 minutes to perform the hair cut. The Plaintiff's mother stated that Plaintiff's perception of time is not good. The Plaintiff also cut her hand with her own scissors. Because there was a break to deal with that, it took a total of one hour and forty-five minutes to complete the task. The actual haircut itself took 45 minutes.

Her mother testified the Plaintiff was in special education classes in high school. Although she was athletic, the Plaintiff had trouble playing on teams, learning plays and following through with other people. The Plaintiff's mother testified that, because of depressive issues, the Plaintiff sometimes lacked motivation to get up, get dressed and leave the house. Medications helped to some degree.

ALJ's Decision

The ALJ determined that Plaintiff had not worked since her application dates, and that she suffered from the severe impairments of obesity, asthma, ADHD, learning disorder, borderline intellectual functioning, depression and anxiety. The ALJ found that none of her impairments met any of the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered her mental impairments under Listings 12.02, 12.04 and 12.06. The ALJ did not consider Listing 12.05, stating that "Listing 12.05 does not apply in this case." R. 15.

The Plaintiff notes that in discussing the Listing of Impairments, the ALJ does not include any reference to actual IQ scores and there is no discussion of IQ scores in the ALJ's decision concerning the Plaintiff's functional impairments.

The ALJ rejected the opinions of Dr. Trieger, noting "there are no specific findings to support any work related limitation." R. 20. She noted the testing in 2014 showed "borderline to mildly impaired" scores with a GAF of 45, but found Dr.

Trieger not credible because this was a "one-time exam for the sole purpose of the claimant's establishing disability." R. 17. The ALJ gave greater weight to the current treating psychiatrist's GAF score of 62, though no weight to his treatment notes which "consist mostly of the doctor simply recording the subjective statements of the claimant and her mother." R. 20. The doctor's actual observations of the Plaintiff's "brighter thinking" and good mood were also given greater weight.

The ALJ found "there is no evidence to support any limitation" described by Dr. Hardwick. She found "there is no indication by the doctor how she knows the claimant would miss work more than 3-4 times a month." The ALJ further found, "The claimant has not presented medical or other reliable evidence that she is unable to perform a full range of work at all exertional levels." R. 21.

The ALJ did not assess the opinions of Dr. Taylor. She found that, because of "moderate limitations in concentration, persistence or pace due to all her mental problems combined," she was limited to "simple, routine and repetitive" jobs that could be "demonstrated to the worker rather than depending on reading materials." R. 18. Because of asthma and obesity, the Plaintiff would have to avoid concentrated exposure to respiratory irritants. The ALJ found that, based on the Plaintiff's residual functional capacity, there were still a significant number of jobs available for her to perform.

## III. DISCUSSION

### A. Standard of review

To establish disability, the Plaintiff must demonstrate that she had a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that prevented her from performing substantial gainful activity. When, as here, the Appeals Council denies review, the ALJ's decision stands as the final decision of the Commissioner. See Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010). The Act specifies that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (citations omitted). Although the Court's task is not to re-weigh evidence or substitute its judgment for that of the ALJ, the ALJ's decision "must provide enough discussion for [the Court] to afford [the Plaintiff] meaningful judicial review and assess the validity of the agency's ultimate conclusion." *Id*. at 856-57.

### B. Listing 12.05

#### 1. Listing Requirements and IQ

The Plaintiff alleges the ALJ erred at step three when she did not consider the

Plaintiff's claim that her impairments met or were equal to Listing 12.05C. A claimant has the burden of proving that her impairment satisfies each of the criteria of a listing and her condition meets or equals a listed impairment. *See Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999). "[A]n ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015).

The ALJ mentioned Listing 12.05 but, by simply stating, "Listing 12.05 does not apply in this case," the Plaintiff contends the ALJ provided less than a perfunctory analysis of the listing. In *Minnick*, the Seventh Circuit noted that an ALJ's two-sentence dismissal of a claimant's alleged impairment was "the very type of perfunctory analysis we have repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing." *Id*. at 935-36.

The listing at issue here provides as follows:

12.05 Intellectual disability: Intellectual disability refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and

14

significant work-related limitation of function.

20 C.F.R. part 404, Subpart P, Appendix I, Listing 12.05C.

The Defendant asserts that, throughout her Decision, the ALJ discussed evidence demonstrating why the Plaintiff's impairments did not meet or equal Listing 12.05C. Because medical sources diagnosed the Plaintiff with borderline intellectual functioning and/or a learning disorder and not intellectual disability, the Defendant alleges that the evidence supports the ALJ's determination that Listing 12.05 did not apply. The Defendant claims the Plaintiff's IQ scores were above 70 and she did not have mental retardation or an intellectual disability and did not demonstrate deficits in adaptive functioning. The Plaintiff contends that no language in Listing 12.05C requires a formal medical diagnosis of intellectual disability (formerly "mental retardation"). It requires only that the impairment meet the diagnostic description.

An IQ test used pursuant to Listing 12.05C must be valid. *See Maggard*, 167 F.3d at 380. In *Mendez v. Barnhart*, 439 F.3d 360 (7th Cir. 2006), the Seventh Circuit suggested that borderline intellectual functioning can meet the listing under certain circumstances.. *See id*. at 362 ("It is something of a puzzle that the regulations require more than valid IQ test results to demonstrate mental retardation, but the explanation may lie in the fact we noted earlier that an IQ of 70, which figures prominently in the criteria for disability based on mental retardation, is at the

borderline between retardation and normal, if low, mental ability."). In *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565 (7th Cir. 2003), the claimant had no formal diagnosis of intellectual disability but had been diagnosed with speech and language delays; he also had a valid IQ score of 70. *See id*. at 569-70. The Seventh Circuit determined that the ALJ had failed to build a logical bridge from the evidence to her conclusions and thus remanded the case for further proceedings. *See id*. at 570-71. It is intellectual disability "within the meaning of the regulation" that triggers Listing 12.05C. *See Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007). Accordingly, it is apparent that no medical diagnosis is necessary in order to establish intellectual disability under the listing.

In *Scott v. Barnhart*, 297 F.3d 589 (7th Cir. 2002), the Seventh Circuit considered a case involving a child whose claim centered on a childhood listing similar to Listing 12.05 (112.05) and concluded that the ALJ's failure to discuss or even specifically reference Listing 112.05 warranted remand. *See id*. at 595-96. The ALJ must build an "accurate and logical bridge from the evidence to [her] conclusion" to allow reviewing courts to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Id*. at 595.

The Plaintiff notes that, because the Plaintiff had not yet turned 22 at the time of her hearing, all deficits of record pertain to the period before she was 22. Dr.

Trieger tested the Plaintiff twice on an appropriate and sanctioned IQ test. Each time, the results showed a valid IQ of 70 or less. Dr. Trello measured a processing speed score in the "mildly mentally retarded" range on a test measuring the ability to work quickly and maintain focused and steady concentration. R. 408. Dr. Trello and Dr. Trieger both found that Plaintiff would need help handling her own money.

The Defendant claims that IQ testing by Dr. Trieger did not establish verbal, performance or full scale IQ of 70 or below. The Plaintiff's scores recorded by Dr. Trieger at age 20 were as follows: Verbal Comprehension score of 70, Perceptual Reasoning Score of 81, Working Memory Score of 74, Processing Speed Score of 71 and Full Scale IQ of 70. Dr. Trieger then notes that he is 90% confident that each of these scores fall within a particular range.

The Defendant further alleges the Plaintiff has not shown that the ALJ erred in accepting IQ testing performed in December 2012 showing her IQ score as 79, which is "in the upper continuum of the borderline range of general intellectual functioning." R. 16. The Plaintiff points out that the same test determined that her processing speed score compared to an average individual 8 years and 4 months old, "within the mild mentally retarded range of scores" (0.1 percentile), though the ALJ's Decision did not mention the Plaintiff's processing speed. R. 408.

Additionally, while the ALJ did not explicitly analyze the test scores the

Plaintiff cites, the Plaintiff fails to show harmful error. However, the Plaintiff contends that this demonstrates that the ALJ simply "cherry-picked" that evidence which would support a denial of the Plaintiff's claim, while ignoring evidence in her favor.

Because the Plaintiff presented evidence of a valid verbal, performance, or full scale IQ of 60 through 70, the Court concludes that the Plaintiff has met the requirements of Listing 12.05C with respect to IQ testing.

## 2. Adaptive Functioning

The Defendant contends that Plaintiff has not established that she has deficits in adaptive functioning and, therefore, any error regarding IQ scores is harmless. The Plaintiff alleges the ALJ did not make such findings as an assessment of adaptive functioning. Rather, she reviewed them from the perspective of a step three assessment of the "B" criteria of other listings and in assessing residual functional capacity. All that is required under Listing 12.05C is the presence of "deficits." A claimant need not show that all adaptive behavior is precluded, severe or disabling by itself. The Plaintiff asserts that a proper consideration of the Plaintiff's activities under Listing 12.05C could well yield a different result on remand. The Defendant alleges the ALJ was not required to repeat this analysis when discussing Listing 12.05C. Reviewing courts should not discount an ALJ's discussion simply because

it appears in the wrong place in the decision. *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015). "To require the ALJ to repeat such a discussion throughout his decision would be redundant." *Id*.

The term "deficits in adaptive functioning" denotes an "inability to cope with the challenges of ordinary everyday life." *See Novy*, 497 F.3d at 710. The Plaintiff alleges that, although the ALJ did not discuss "adaptive functioning" at all because she refused to address Listing 12.05C, the ALJ cited the Plaintiff's ability to complete cosmetology class and tests. The ALJ also noted that Plaintiff played softball and took classes in history, English and algebra. However, the Plaintiff contends that the ALJ essentially ignored the manner in which cosmetology class and tests were completed (with a Section 504 Rehabilitation Plan, with readers provided, with extra time provided, with constant supervision, with extra months of study, etc.); along with various problems described by her mother in performing daily activities; her teachers in performing basic school work; her low reading, math and expressive language and her long-term psychologist's description of "noteworthy deficits in adaptive functioning" that did not allow for independent living. The Plaintiff asserts that is sufficient to meet Listing 12.05C.

The ALJ did note that Plaintiff "reportedly needed close supervision to complete tasks, but there was no indication that this was true in her cosmetology

classes," relying on her education records.  R. 15.  The ALJ also observed that, despite her claims of needing significant assistance, the Plaintiff "said she did pass her Board test, even though she said she took extra time and had a reader, she passed a state test certifying that she was able to perform a skilled SVP 6 job."  R. 16.  The Defendant alleges the Plaintiff's ability to complete classes and become board certified to work a skilled job undermine her claim of deficits in adaptive functioning.

The Defendant states the ALJ noted that in May 2012, a consultative psychologist discussed activities of daily living and did not mention any significant problems with activities.  The Plaintiff was able to do self-care tasks and chores at home.  The Plaintiff performed tasks such as washing dishes, fixing simple meals, shopping for groceries with her parents, watching television, reading magazines, using the internet, texting, socializing with friends, going to the movies, attending to personal hygiene, playing soccer, traveling and walking her dog.  She applied for employment at the YMCA.  However, the Seventh Circuit has "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Mendez*, 439 F.3d at 362.

The Plaintiff claims she produced evidence of deficits in adaptive functioning, based on her psychologist's diagnosis; the Plaintiff's extremely low reading, math

and expressive language; teacher reports and her mother's testimony. The Plaintiff contends the ALJ did not determine there were no such deficits. The ALJ simply did not discuss the evidence in conjunction with 12.05C.

The Defendant claims that, even if one or two of these criteria were met, the Plaintiff has not shown that all criteria were met or medically equaled. Accordingly, the Defendant alleges the Plaintiff has not shown the necessary baseline criteria to meet or medically equal Listing 12.05.

The Seventh Circuit has noted the ALJ's discussion of a claimant's severe and non-severe impairments, the objective medical evidence and the claimant's credibility in the residual functional capacity analysis "provides the necessary detail to review the ALJ's step 3 determination in a meaningful way." *Curvin*, 778 F.3d at 650. The ALJ need not analyze every piece of evidence. *See id*. at 650-51.

In this case, however, the record suggests that the ALJ ignored evidence in the record of deficits in adaptive functioning. It appears that the ALJ minimized certain evidence regarding the manner in which she completed cosmetology class and tests. The Plaintiff's psychologist described "noteworthy deficits in adaptive functioning." Her low reading, math and expressive language scores are indicative of deficits in adaptive functioning. While the ALJ noted the Plaintiff's IQ was determined to be 79 in December 2012, the ALJ does not mention another part of that test which fell

"within the mildly mentally retarded range of scores (0.1 percentile)." "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Based on the foregoing, the Court concludes that the ALJ erred in failing to analyze Listing 12.05C. Given the evidence in the record which suggested impaired adaptive functioning prior to age 22 and at least one IQ score of 70 or less, the ALJ was required to discuss the listing by name and offer more than a perfunctory analysis of the listing. *See Minnick*, 775 F.3d at 935.

Because the ALJ failed to explain why Listing 12.05 does not apply, the Court is unable to find that she built an accurate and logical bridge from the evidence to the conclusion. Accordingly, the Court concludes that the decision is not supported by substantial evidence.

On remand, the ALJ shall consider whether Listing 12.05 applies and evaluate any relevant medical source opinions.

Ergo, the Plaintiff's Motion for Summary Judgment [d/e 11] is ALLOWED, to the extent that the Commissioner's Decision is Reversed and the action is Remanded.

The Defendant's Motion for Summary Affirmance [d/e 16] is DENIED.

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Clerk shall enter a Judgment.

This case is remanded to the Commissioner of Social Security for further proceedings consistent with this Opinion.

The Clerk will substitute Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, as the Defendant in this case.

ENTER: November 1, 2017

FOR THE COURT:

/s/ *Richard Mills*
Richard Mills
United States District Judge